981 So.2d 756 (2008)
Larry FOSTER and B.J. Fuller, Plaintiffs-Appellants,
v.
U.S. AVIATION UNDERWRITERS, INC., et al., Defendants-Appellees.
No. 43,056-CA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 2008.
Fewell-Kitchens by Richard L. Fewell, Jr., Theodore Julius Coenen, IV, Monroe, *757 for Appellants, Larry Foster and B.J. Fuller.
Deutsch, Kerrigan & Stiles, L.L.P. by Robert Emmett Kerrigan, Jr., Charles Eustace Leche, New Orleans, Davenport, Files & Kelly, L.L.P. by W. David Hammett, William G. Kelly, Jr., Monroe, for Appellees, U.S. Aviation Underwriters, Inc., Stephen Merle Gustafson, and AgAero, Inc.
Mulhearn & Smith, Inc. by LeRoy Smith, Jr., Tallulah, for Appellees, Bert T. Batchelor, Billy Ray Hodge, and Islington Plantation.
Before BROWN, WILLIAMS and DREW, JJ.
DREW, J.
Plaintiffs appeal a judgment denying their claim that drift from the aerial application of pesticides reached four of their crawfish ponds and caused the death of nearly all crawfish in those ponds. We affirm.

FACTS
Plaintiffs Larry Foster and Beverly J. Fuller operate a crawfish farm in Madison Parish, Louisiana. The farm consists of five ponds totaling approximately 211 acres, with the largest pond measuring 100 acres. Ditches surround the farm on three sides. Two tracts of land abut the entire southern border and part of the western border of the crawfish farm. These tracts ("Area One"), which encompass 225 acres, contain cotton fields that were farmed by Billy Ray Hodge. Hodge also farmed cotton fields ("Area Two") covering 1275 acres that are located to the south and predominantly to the southwest of Area One. A copy of an exhibit showing the area in question is attached to this opinion.
In July of 1999, Hodge hired Steve Gustafson, a pilot with 17 years of experience, to make an aerial application of two pesticides, Baythroid and Curacron, to his cotton fields. The Baythroid was to be applied at a rate of one gallon to 60 acres, and the Curacron was to be applied at a rate of one gallon to 20 acres.
At approximately 6:27 a.m. on July 9, 1999, Gustafson's 502 Air Tractor took off from the runway. The pesticide tank on Gustafson's plane held only 500 gallons, so he had to make several trips to the airport in order to refill the tank with the liquid mixture containing the pesticides. Because of the prevailing wind direction, he applied the mixture only to Area Two on July 9, and returned three days later to spray Area One.
Gustafson began releasing the mixture first on the north side of Area Two, and then worked his way south. Gustafson finished at around 9:30 or 10:00 that morning.
Foster's home was located on the extreme southwest corner of the property containing the crawfish ponds. On the morning of July 9, the house was being ventilated by a fan pulling air through the window. Foster, whose bedroom was on the south side of the house, claimed that he woke up that morning gasping for air. He noticed an unfamiliar smell, then heard the sound of Gustafson's plane.
When Foster later went outside, he noted the number on Gustafson's plane. Foster observed insects flying erratically, and he claimed that when he went to the ponds, he saw crawfish crawling up the banks, turning over on their backs and wiggling their legs. Fuller recalled seeing crawfish flipping over and moving their legs after being placed in a bucket.
Foster called the Monroe office of the Louisiana Department of Agriculture and *758 Forestry ("Department") to report a possible pesticide kill. Douglas Gillette, a nursery superintendent for the Department, responded to Foster's complaint at approximately 3:00 that afternoon. Gillette took a water sample shortly after he arrived. Following his routine, Gillette placed the water sample in an ice chest with ice to take to his office, where it was placed in a refrigerator. The sample was shipped to a Department chemistry lab in Baton Rouge by bus on July 15, and was received by the lab the next day. The sample seal was broken, and testing for the presence of Baythroid and Curacron was done on July 19. The test revealed that the sample contained Curacron at 0.148 parts per billion ("ppb"). Baythroid was not detected at a level of 0.14 ppb, which was the lowest level tested.
Foster and Fuller filed suit against U.S. Aviation Underwriters, Inc.; Steve Gustafson; AG-Aero, Inc.; Bert Batchelor, whose family owned Area One; Billy Ray Hodge; and Islington Plantation, a partnership of which Hodge is a member. They claimed that pesticide drift killed all of the crawfish in four of their five ponds, which prevented them from having brood stockers available for the next year's crops in those ponds.[1] They asserted that the pond closest to their home was not affected because it was dry on July 9, so it was the only pond from which they were able to harvest crawfish in 2000. They further asserted they were able to harvest from an additional pond in 2001. They sought damages for the sales they lost in the years 2000 and 2001.[2]
A bench trial was conducted over four days in August of 2006. After plaintiffs rested, the trial court granted a directed verdict dismissing the claims against Hodge and Batchelor. The trial court ultimately rendered judgment in favor of all defendants. Plaintiffs have appealed.[3]

DISCUSSION
The trial court found no evidence that Gustafson was negligent in the aerial application of the Baythroid and Curacron on July 9. The trial court further found no credible factual or scientific evidence of a massive crawfish kill on plaintiffs' farm on that date.
Plaintiffs argue that because they relied on circumstantial evidence alone to prove negligence, the trial court should have applied the doctrine of res ipsa loquitor to find in their favor. One criterion for the application of this doctrine is that the injury suffered by plaintiff be the kind which ordinarily does not occur in the absence of negligence.[4] However, the trial court clearly found that plaintiffs did not even sustain an injury, i.e., a massive crawfish kill. The trial court's findings of fact are subject to the manifest error standard of review.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Cole v. *759 Department of Public Safety & Corrections, 2001-2123 (La.9/4/02), 825 So.2d 1134; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Cole, supra; Rosell v. ESCO, 549 So.2d 840 (La. 1989). To reverse a fact finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart, supra.
Based upon our review of this record, we cannot conclude that the trial court was clearly wrong in concluding that no massive crawfish kill occurred, and Gustafson did not negligently apply the pesticides.
Unlikeliness of a drift
Before Gustafson took to the air on the morning of July 9, the wind was measured at the airport as blowing from the south at 2 mph. The airport is several miles away from the area where he was to spray. When Gustafson checked the wind direction at the cotton fields by releasing smoke from the plane's exhaust, the smoke showed the wind as coming from the south-southeast. He never saw the wind turn in the direction of the ponds. Upon filling out a complaint consent form for Gillette, Foster wrote that the wind had been blowing out of the south-southeast. These winds would not have carried any drift over the crawfish ponds.
Gustafson was familiar with the area and knew the location of the ponds, so he paid special attention that day when applying the chemicals. Even though he had been hired to spray Areas One and Two, he decided not to spray Area One on July 9 because of the wind direction. He waited until three days later to complete his task when the wind was blowing from the north.
Even if the wind changed direction and carried any drift in the direction of the ponds, Area Two was far enough away from the crawfish ponds that any drift would not have adversely affected the ponds. Area Two was approximately half a mile from the ponds, and the closest pond was the dry pond that plaintiffs contended was unaffected.
Apparently, there were trees along a bayou which separated Areas One and Two. There were also trees along the ditches that bordered the crawfish farm. Foster claimed that when Gustafson would pull up over the trees, he would make a turn while over the fields that are past Foster's house, and then return to where he was spraying. Foster also stated that he observed that even if Gustafson stopped spraying just before he pulled up, the spray still followed the plane up in the air. Gustafson explained that when dealing with trees, he would stop spraying chemicals before pulling up, and then make trim passes along the edge of the tree line to apply the chemicals. His plane generally traveled 135 mph when spraying.
Presence of pesticides in the water
Gillette took the water sample from an area that was basically in the middle of the five ponds, an area that Gillette noted was where Foster said most of the drift had entered. The sample was recorded as being taken at 3:30 in the afternoon. Dr. Lance Fontenot, who testified as an expert in environmental toxicity and the assessment of aquatic toxicity of pesticides, noted that Gillette's action in putting the water *760 sample on ice in a cooler was standard protocol. Foster contradicted Gillette's testimony that the water sample was placed in a cooler.
The test showed the presence of Curacron at 0.148 ppb in the water sample. Baythroid was not detected in the sample at a level of 0.14 ppb. Questions were raised about the condition of the sample when it was tested ten days later, particularly as it pertained to Baythroid, which is relatively insoluble, and which has been reported to float on the water surface like a film. It was thought that Baythroid, a pyrethroid, would break down as quickly as in one day if exposed to the sun.
Dr. James Avault, Jr., testified as an expert in the ability to raise crawfish, the general effects of pesticides on crawfish, and the general economics of raising crawfish. Dr. Avault opined that pyrethroids in general break down rapidly, but he did not feel comfortable in determining how much Baythroid would have degraded over ten days. Dr. Fontenot agreed that Baythroid can break down in one day if exposed to sunlight, so it was possible that it had degraded somewhat by the time it was tested. Nevertheless, Dr. Fontenot thought that degradation of the Baythroid would have been insignificant. As for Curacron, Dr. Fontenot would have expected only a negligible degradation of the Curacron before it was tested.[5]
The sample was tested only for the presence of Baythroid and Curacron. The analysis was done with gas chromatography to see if there was a match for the two pesticides.[6] The test did not detect the presence of Baythroid. Dr. Avault agreed that there was no scientific evidence that Baythroid was present in the water.
Dr. Fontenot was not entirely convinced that Curacron was even present in the water sample. He explained that the detected level was so low that the analyst, who was specifically looking for its presence, could barely discern that it was even present. Dr. Fontenot thought it could have been a false positive for Curacron, but he could not say for certain because he did not look at the chromatogram. Curacron would have displayed one peak on the test, and Dr. Fontenot considered that there could have been noise in the chromatogram.
Effect of the pesticides on crawfish
When searching for a culprit for the alleged massive crawfish kill, Dr. Avault began by ruling out water supply contamination because Foster used a well as a water source. A lack of oxygen for the crawfish and the presence of a disease were also ruled out as causes because neither condition would have killed all the crawfish at once. In Dr. Avault's opinion, this left the pesticides as the only culprit.
Dr. Avault was unaware of any study showing that Curacron was lethal to crawfish at 0.148 ppb. However, he recalled that the toxic minimum dose for shrimp was .006 ppb. Dr. Fontenot agreed with Dr. Avault that there were no specific studies of the effect of Curacron on crawfish.
Dr. Fontenot found studies of Curacron's effect on the micro-crustaceans Gammarus and Daphnia. Unlike crawfish, *761 which are benthic crustaceans in that they live at the bottom of the body of water, Daphnia live in the water column. For Daphnia, which Dr. Fontenot considered to be more sensitive to chemicals than crawfish are, the EC-50 was in a range of 0.5 ppb to 2.8 ppb.[7] The LC-50 for Gammarus was 0.8 ppb to 1.8 ppb.[8] Dr. Fontenot calculated the risk quotient of Curacron to Daphnia as being in the acute risk range, although it could be mitigated. Nevertheless, he did not think that the risk quotient alone proved that Curacron caused a crawfish kill.
Dr. Avault recalled a Spanish study which showed Baythroid to be very toxic to crawfish, but he could not remember the lethal concentration. The Spanish study was done with the same type of crawfish as those found in Louisiana. Although Dr. Avault could not find a study showing the relevant LC-50 for Baythroid, he pointed out a Wisconsin study where there was a 100% kill of crawfish in the lab with the application of 0.05 ppb of Baythroid.
Dr. Fontenot stated that there were no LC-50s for crawfish for either chemical, but he agreed that both pesticides at issue are very toxic to crawfish. He did not spend much time on Baythroid when drafting his report because it was not detected in the test. But based on the data, he thought that Baythroid was the more toxic to crawfish.
Dr. Fontenot agreed that the 0.05 ppb level for Baythroid in the Wisconsin study was lower than what was tested at the lab. However, Dr. Fontenot noted that the 0.05 ppb test was done on rusty crawfish, which are not the same as the red swamp crawfish at issue.[9] In addition, studies in the lab are more controlled than field studies.
Dr. Fontenot concluded that based on the water sample, his review of the toxicity literature data, and the observations made by Gillette, Curacron and Baythroid were not likely to have caused a significant crawfish kill. He estimated that based upon LC-50 data alone, the level of Curacron found could have killed zero to one percent of the crawfish.
Dr. Fontenot was asked whether, assuming that a crawfish kill had occurred, the most likely explanation was that the pesticides caused it. He responded in the negative, explaining that Baythroid was not detected and the level of Curacron was too low to have done it.
Lack of evidence of dead crawfish
Although this was Gillette's first crawfish kill to investigate, he had investigated pesticide complaints and fish kills in the past. He wrote in his report that he was taken to the pond where most of the drift entered. Gillette observed four or five dead crawfish, and four or five crawfish crawling up the bank. Foster claimed that it was difficult to see the edge of the ponds unless the vegetation surrounding them was moved, but Gillette did not want to do that, saying that all he needed was the water sample.
Gillette checked several traps in two ponds, but he could not find enough crawfish, *762 dead or alive, to take a sample.[10] Foster said that he found lethargic crawfish in a couple of traps, and dead crawfish in another trap. Foster stated that he interpreted Gillette's saying he needed a bag full of dead crawfish as a sample to mean 35 pounds of crawfish.
Gillette took two photographs at the ponds, which showed the area where the sample was taken and the approximate area of the complaint. Gillette testified that if he had seen a significant number of dead crawfish, he would have taken a photograph of them. Gillette estimated that he was at Foster's ponds possibly until 4:30 in the afternoon. Foster said that Gillette lied or was mistaken when testifying that he arrived at the ponds that afternoon. Foster said Gillette was there at 11:00 in the morning; however, Billy Ray Hodge testified that Gillette asked him for directions to Foster's ponds at approximately 2:00 in the afternoon.
Foster began drawing the water down in the ponds on the afternoon of July 9. Foster claimed that when he did this, he noticed thousands of pounds of dying crawfish in the four affected ponds. He also claimed that almost all the crawfish in the ponds that had had standing water were dead within eight hours after the application of the pesticides. Fuller claimed that the next afternoon she saw all the dead crawfish, mostly closer to the levees, as well as birds eating them.
Dr. Avault thought it was logical that Gillette did not see many dead crawfish. He cited a Wisconsin study where Baythroid was applied in the field, and it took six hours for the crawfish to begin dying. Looking at the photos taken by Gillette, Dr. Avault thought the vegetation around the ponds was heavy and could have obscured Gillette's view of crawfish going to the pond's edge.
Dr. Fontenot explained that if Baythroid had been present in high enough levels to kill the crawfish, the crawfish would have begun dying within an hour or two and there would have been many killed within eight hours. Thus, he would have expected Gillette to see more than four or five dead crawfish. Dr. Fontenot thought that, particularly with Baythroid, the highest concentration of the chemicals would have been when the drift hit, so it would be illogical to say that the kill would occur later rather than earlier.
Foster, Fuller, and their family members had a history of collecting evidence in the event of a pesticide contamination. Gustafson and Hodge stated that Foster and Fuller had filmed or videotaped them spraying the fields at times prior to the incident. There was also the practice of keeping a log of the numbers of the planes that had been spraying near their ponds in case something happened. Interestingly, although Foster admitted that he had a camera available, he did not take photos to document the thousands of dead crawfish that were now exposed. Foster claimed that Gillette had told him it was not necessary for Foster to take any photos because Gillette had already taken them. Gillette denied telling Foster not to take any photographs of dead crawfish.
Foster claimed that when he called the Monroe office to tell them about seeing the thousands of dead crawfish, he was told that there was no need to take any sample of crawfish. Fuller said she heard Foster make this call. Gillette denied that he received any calls about Foster finding additional damage.
*763 Gillette also denied telling Foster not to take his own water samples or to gather a sample of crawfish. Foster actually gathered up his own sample of dead crawfish, but then he disposed of them after a few weeks. Foster also disposed of a water sample that he had taken before Gillette had arrived.
Foster claimed that most of the dead crawfish were gone in two days, presumably eaten by birds. Dr. Avault thought that birds could have eaten the dead crawfish in a couple of days. Dr. Fontenot testified that Curacron is moderately to highly toxic to birds. When Gustafson flew near the ponds on July 12, he did not observe any dead crawfish or birds, he did not see birds swarming over the ponds, and he did not smell decaying crawfish. Billy Ray Hodge went to the ponds over the next few days after July 9, and he did not observe dead crawfish or flocks of birds, nor did he smell an odor. Bert Batchelor heard about the alleged incident the day it happened, and he checked the ponds for about two minutes from the ditch on the east side and did not see any dead crawfish, and he thought everything looked normal.
The behavior of the crawfish on July 9 as described by Foster and Fuller was consistent with exposure to the pesticides. Dr. Avault explained that a dying crawfish lies on its back and moves its legs. He added that a stressed crawfish is unlikely to go into a trap. Dr. Avault also thought that a crawfish exposed to a toxic pesticide in the water would attempt to leave the water. Dr. Fontenot explained that Baythroid and Curacron are neurotoxins, and either could cause crawfish to crawl on their backs and wiggle their legs. Another expert, Dr. Jay Huner, testified that when the water gets very hot, it often does not have much oxygen, so sometimes the crawfish will crawl out from the water for that reason.
Dry pond survivors
Dr. Avault attempted to explain why the crawfish in the drained pond survived the pesticide drift, while their brethren in the other ponds fared much worse. Crawfish burrow any time of the year, although they tend to do it during the summer, as the hotter water encourages them to burrow. Dr. Avault thought the crawfish in the dry pond survived because most likely they had already burrowed, so there was no water to act as a medium for the pesticide to reach the crawfish. Dr. Avault reasoned that since the pond was dry, these crawfish most likely had placed a mud plug on their burrow to maintain humidity.
Several factors call into question Dr. Avault's explanation. First, many of the crawfish in the remaining ponds would also have burrowed at the time because of the rise in water temperature. Second, even if they had not burrowed, crawfish by their nature tend to travel along the bottom of the water body, so they would not have been exposed to the Baythroid floating on the water surface. In the Wisconsin field study, the Baythroid had to be dissolved into another chemical, and then the mixture had to be churned into the water column in order for the crawfish to come into contact with it.
Dr. Avault argued that even if these crawfish had burrowed, their tunnels probably did not have mud plugs, so they were still in contact with the water. Nevertheless, he could not offer much in the way of a theory as to how crawfish at the bottom came into contact with Baythroid on the surface. He thought that perhaps the Curacron stressed them so they came into contact with the Baythroid when they tried to leave the water.
Dr. Jay Huner testified as an expert in all aspects of aquaculture and crawfish *764 farming, including the development of crawfish ponds and habitat, harvesting, and any other aspects of crawfish management. Dr. Huner stated that early in the season, crawfish may or may not seal off their burrows, but as the water temperature gets hotter and it becomes time to reproduce, more and more burrows are sealed off, so he would expect most of the burrows to have been sealed off by July 9. Dr. Huner added that crawfish in sealed-off burrows would be protected from pesticides drifting in the water.
Crawfish in ditches and other ponds
When Dr. Huner visited the crawfish farm in February of 2000, he found many young red swamp and white river crawfish in the ditches surrounding the farm. He stated that he would not have expected to find that many crawfish in the ditches if there had been a massive kill in the ponds the prior summer. Dr. Fontenot thought if pesticides were present in the ponds at levels high enough to kill the crawfish, then it would have been possible that the crawfish in the ditches would have also been killed when the ponds were drained.
Foster testified that in March of 2000, he set 80-90 traps along the levees of pond five, which was the largest pond, but he did not get any crawfish. Dr. Huner found a few crawfish in pond five, but he could not determine if the absence of crawfish was caused by the alleged drift or poor pond management, as he thought the pond closest to the house was the only pond that was adequate for crawfish production.[11] Nevertheless, Dr. Huner believed that if he went to a pond and was able to find four or five crawfish with a dip net, then that pond had a population that could be harvested. Dr. Huner thought it was important that he was able to find non-commercial species of crawfish in his dip nets, because the non-commercial species should have been just as susceptible to the contamination.
Dr. Huner also noted that it was not unusual for him to find more crawfish in a ditch than in a large pond. He explained that the most successful crawfish burrows are along the edges of the water. The small area of a ditch consists mostly of edges, unlike an open large pond, so the ditch is likely to have more crawfish per space measured.
Dr. Avault did not think that the presence the following spring of crawfish in the ponds other than pond one meant that the crawfish kill had not occurred. He thought these crawfish may have entered the ponds from the ditches.
Dr. Huner testified that he did not find any objective or scientific evidence to support a claim that there had been a massive crawfish kill. He certainly did not find shells or crawfish parts that would have remained after such an event. Dr. Huner opined that the number of crawfish that he found when he walked around the ponds that allegedly had been contaminated was sufficient to support a harvestable crop that was similar to what was harvested in 1999.

CONCLUSION
At appellants' cost, the judgment is AFFIRMED.

*765 APPENDIX

NOTES
[1] Foster testified that not enough stockers were available in July of 1999, and he was unable to afford any in 2000 to be used for the 2001 harvest.
[2] Their 1999 harvest was coming to a close at the time of the alleged drift; they had planned on stopping around July 11.
[3] They have not appealed the dismissal of some defendants on the motion for a directed verdict.
[4] See Linnear v. CenterPoint Energy Entex/Reliant Energy, XXXX-XXXX (La.9/5/07), 966 So.2d 36.
[5] Dr. Fontenot stated that Curacron has a half-life of three days in water. He also stated that its half-life is 24 to 62 days in terms of hydrolysis, which is when it breaks apart in water.
[6] Dr. Herschel Morris, Jr., the lab director, testified that although the sample was only tested for those two pesticides, if something else had caused a significant peak on the chromatography, they would have tried to identify it, but nothing else did.
[7] The EC-50 is the concentration that it takes to immobilize 50% of the tested organisms within 96 hours.
[8] The LC-50 is the concentration needed to kill 50% of the tested organisms within 96 hours.
[9] Dr. Avault explained that a rusty crawfish is similar to what is found in Louisiana.
[10] According to Gillette, normally four to five pounds of crawfish would be needed for a testing sample.
[11] Mike Rome, a county agent in Madison Parish who visited the farm in January of 2000, believed at the time that if the farm was properly managed, then it could produce a crawfish crop.